**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

---

ONWARD SEARCH LLC,

         Plaintiff,

      v.

LEANNE OWENS,

         Defendant.

Civil Action No.:   19-343

**COMPLAINT**

---

Plaintiff Onward Search LLC ("Onward" or "Plaintiff") by and through its attorneys, Nelson Mullins Riley & Scarborough as and for its Complaint against Leanne Owens ("Owens" or "Defendant") respectfully alleges as follows:

## NATURE OF THE ACTION

1.    This is an action by Onward, a national firm specializing in job placement and staffing for the digital, creative and marketing industries, for damages and equitable relief in response to conduct by Defendant Owens -- a high level executive of Onward who was the co-founder and senior manager of its Boston office, served on the Company's executive team, was consistently one of Onward's top sales people and the sixth highest revenue producing sales person in the entire Company in 2018 -- of (a) violating a covenant not to compete ancillary to her employment contract with Onward by working for Beacon Hill Staffing ("Beacon") located 1.5 miles from Onward immediately after resigning from Onward, (b) hiring away an Onward employee to join her at Beacon in violation of her non-solicitation covenant pursuant to her employment contract, (c) soliciting a number of Onward employees in the Boston office to leave Onward in further violation of her non-solicitation covenant and committing unlawful raiding, and (d) soliciting Onward's clients in yet another violation of her non-solicitation covenant and (e)

misappropriating Onward's confidential information and trade secrets in violation of her non-disclosure covenant.

2.     Onward hired Defendant Owens on May 19, 2009 to the position of Director to launch and manage Onward's Boston office.  Owens was a highly valued employee, rose to the level of a senior executive of the Company for which she served on its executive team and ran its Boston office from June 1, 2009 to January 25, 2019 when she resigned to join Beacon, a direct competitor, in its Boston office, which blatantly violated her employment agreement.  During her employment with Onward, Owens managed all of the employees in Onward's Boston office, had prior responsibility to oversee Onward's high value accounts and Chicago office, received the highest level access to Onward's confidential information and trade secrets for all of the Company, worked with Onward's clients and recruiting prospects and, upon information and belief, is now using such confidential information and trade secrets to compete unfairly against Onward on behalf of Owens's new employer, Beacon.

3.     On January 22, 2019, just three days before she resigned, she reviewed and downloaded Onward's 2018 and 2019 budget documents containing confidential financial information related to all of the Boston office operations including, but not limited to the compensation for all Boston office employees and projections regarding Onward's Boston office.

4.     Within days of her joining Beacon, Owens began an aggressive campaign to recruit away Onward's seven remaining Boston office employees.  Defendant successfully hired away Julia Rosenthal on February 27, 2019, a junior employee with only eight months of recruiting administrative support experience who Onward had just hired on January 7, 2019.  Given the *de minimis* value to Beacon of such an inexperienced employee, Defendant's efforts to hire away Rosenthal evidences an attempt to cripple the small Onward Boston team.  Owens also

aggressively solicited Tim Sullivan, who in 2018 was Onward's highest billing recruiter and ranked eighth overall among 101 sales people in the Company, to join her at Beacon by referring him for an interview, attending his interview, discussing compensation with him, and persistently following up through meetings, phone calls, and text messages to convince him to leave Onward.

5.    Defendant solicited at the very least Onward clients Cantina, Broadleaf/BBH, Mintz Levin, Fidelity Investments and ExtensionEngine who are significant clients and with which Onward has current assignments to place candidates for temporary roles.

6.    Defendant had full and total access to all confidential financial, production, and operations data and information that Onward generated and maintained for her territory including, but not limited to, lists of clients and prospects, all contacts at each client, lists of talent/candidates, open jobs, bill and pay rates, sales pipelines, activity and production metrics, all contracts, compensation and incentive plans for all staff, office business plans and budgets, and full access to all financial information on the territory such as the P&L, revenue, gross margin, expenses, and operating income.  In addition, through Bullhorn, Onward's internal database that contains all of Onward's data regarding candidates and clients, Owens had access to production information related to all of Onward's offices, not just to the Boston office. Furthermore, as Senior Vice President, Owens had access to Onwards Report Server, which was restricted to managers who were director level and above, that enabled her to run detailed reports activity and production for the Boston office, and all of Onward's other offices.

7.    Defendant Owens is unfairly competing with Onward by raiding and tortiously interfering with Onward's employees.

8.    Onward seeks immediate, temporary injunctive relief in the form of preliminary and permanent injunctions, including a temporary restraining order, to require Defendant Owens

3

to discontinue her employment with Beacon for twelve months, to require Owens not to solicit its employee and customers for twelve months, to require Owens to return — and to prevent Owens from retaining, using and misappropriating — Onward's files and confidential information and trade secrets, and to prevent Owens from raiding and tortiously interfering with Onward's employees, thereby causing Onward any further irreparable injury.

9.      Onward also seeks economic damages, attorneys' fees and punitive damages for Defendant's unlawful activity.

## JURISDICTION

10.      This Court has subject-matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332 because it is a civil action where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

11.      This court has personal jurisdiction over Defendant because her tortious acts caused injury to Plaintiff at its corporate headquarters in Connecticut and because Defendant regularly communicated with Plaintiff at Plaintiff's corporate headquarters in Connecticut and attended meetings at Plaintiff's corporate headquarters in Connecticut, all in the course of performing her regular job responsibilities for Plaintiff.

12.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because the Plaintiff resides in the district, having its corporate office located at 64 Danbury Road, Wilton, Connecticut.

## PARTIES

13.      Plaintiff Onward is a Delaware corporation with a principal place of business address located at 187 Danbury Road, Wilton, Connecticut.

14.      Defendant Owens, is an individual residing at 17 Indian Hill Street, West Newbury,

Massachusetts.

## FACTUAL ALLEGATIONS

### *Onward's Confidential Information and Trade Secrets*

15.    Onward is a leading provider in the staffing industry and conducts business nationwide.

16.    Onward has a well-established customer base and operates twelve (12) offices throughout the United States including: Atlanta, Georgia; Boston, Massachusetts; Charlotte, North Carolina; Chicago, Illinois; Denver, Colorado; Miami, Florida; New York, New York; Los Angeles, California; Red Bank, New Jersey; San Francisco, California; Orange County, California; and Wilton, Connecticut.

17.    Onward specializes in the recruitment and placement of digital, creative, and marketing professionals in permanent and temporary assignments with employers across all industries including, but not limited to, advertising, finance, entertainment, technology, hospitality, and retail.

18.    Onward's customers are businesses and employers within these industries who recruit and retain qualified candidates for open positions.

19.    The positions Onward staffs for these customers are highly specialized and often relate to web design, user experience, art direction, mobile development, and digital marketing.

20.    Onward's business is highly competitive and constantly evolving.

21.    To conduct its business, Onward relies upon confidential and trade secret information which includes its candidate and customer contact information, customer needs and preferences, candidate skill profiles, pricing models, cost structures, terms of commercial agreements with customers, current and prospective business plans, information about its current

and prospective lines of business, talent or individuals placed at Onward's customers, and targeted customers, industries and markets.

22.     This confidential and trade secret information took Onward significant resources and costs and several years to develop.

23.     Onward's candidate contact information, business plans and strategies are of great interest to its competitors, such as Beacon, and are not disclosed to anyone outside Onward.

24.     Onward's relationships with businesses and leaders in the digital, creative and marketing industries are the core of its business.  Through great time, effort, and expense, Onward developed, nurtured and grew strong business relationships with numerous customers around the United States, including, but not limited to, a number of high value accounts .

25.     The high value accounts are a major source of Onward's business.

26.     The high value accounts are principally, but not exclusively, comprised of large national and global businesses who specifically engage Onward to provide staffing solutions on a recurring basis.

27.     Onward employs and dedicates an exclusive team of staffing professionals to create comprehensive and customized strategies to deliver talent fulfillment programs for these high value accounts.

28.     To implement these programs, Onward maintains an established internal recruitment industry network.

29.     With respect to all of its customers, including the high value accounts, Onward has developed and maintains confidential information and trade secrets that includes, but is not limited to, information about their current and future staffing needs and preferences, bill rates, pricing and revenue information, candidate information, information about whether they will be hiring and

expanding their business, the terms of negotiated agreements, and the identities of the key players and decision makers.

30.     In addition to the above, to be able to meet customer needs, Onward has spent years amassing data regarding hundreds of thousands of potential candidates, which includes their contact information, skills sets, and current employment status.  This information is confidential and is essentially a road map for a competitor to take market share away from and ultimately harm Onward's business.

31.     Were Onward's confidential information and trade secrets disclosed to a competitor, such as Beacon, it could be used to gain an advantage over Onward in the marketplace.

32.     Onward stores its confidential information and trade secrets in an internal database called Bullhorn with limited access for its employees.  Only Onward employees – each with unique login credentials – have access to Bullhorn.

33.     Onward also has a Report Server that allows only managers who are Director level or higher to run reports of summary level detail regarding the production and activity for the whole company and compare the performances of different Onward offices.  The Report Server can also run detailed reports regarding a specific office.  Defendant was one of only 17 managers out of 108 Onward employees (revenue producers and non-revenue producers) with access to the Reports Server.  She was one of only two people in the Boston Office with access to these types of reports; only the Onward President and C-suite level executives were able to view these reports regarding the Boston office.

### *Defendant's Employment History With Onward Search*

34.     According to her resume that she submitted to Onward, Defendant has worked in the staffing industry since May 1992.

35.    Defendant's resume indicates that prior to joining Onward, she worked for five years as an Area Manager for Aquent, LLC, another staffing agency in Boston, and held similar roles at the Gillette Company, Gateway Computers, and a variety of staffing and recruiting agencies, mostly in Massachusetts and New England.

36.    On May 19, 2009, Onward hired Defendant as a Director of Staffing to open its new Boston office.  She was responsible for launching the office, establishing a market strategy, opening client relationships, hiring and building sales and recruitment teams, and establishing Onward in the Boston market.  Defendant also managed her own individual set of client accounts that Onward assigned to her.  Onward trusted Defendant with full budgetary (also referred to as profit and loss ("P&L")) responsibility for the Boston Office.

37.    On April 4, 2010, Onward promoted Defendant to Regional Vice President and added the management of its Chicago office to Defendant's responsibilities.  With this promotion, Defendant was elevated to become a member of Onward's executive team, on which she remained until she resigned.

38.    The executive team consisted of all Regional and Senior Vice Presidents and above. The executive team meets weekly or bi-weekly with the Onward President and/or CEO and has responsibility for directing Company operations, culture, policy, and strategy.

39.    On September 21, 2012, Onward promoted Defendant again, this time to Senior Vice President and adding oversight responsibility for the "National Accounts" team and corresponding strategy to her role.  In this role she was tasked to grow large Fortune 1000 accounts with multiple locations, while still maintaining full P&L responsibility for the Chicago and Boston operations.

40.     By January 2017, Defendant's role was refined to focus exclusively on Boston and the Northeast.

41.     Throughout her career at Onward, in addition to her management responsibilities, Defendant was one of Onward's top sales producers, handling the existing Onward clients that she manages and developing new Onward clients.  She was the first or second largest producer (based on gross margin) from 2009 through 2015.  Since then, she has performed within the top ten sales producers among approximately 100 producers at Onward.

### *Defendant's Employment Agreement With Onward*

42.     Defendant entered an agreement the terms of which are set forth in an offer letter dated May 19, 2009 (referred to herein as "Employment Agreement," attached as Exhibit A) in connection with her employment with Onward.

43.     The Employment Agreement provided Defendant with a starting annual base salary equivalent to $85,000, benefits, and the opportunity to earn substantial incentive compensation.  Pursuant to the Employment Agreement, Onward also provided Defendant confidential information and trade secrets.  During the course of her employment, Defendant also received as part of her compensation stock options in Onward and in a subsidiary of Onward.  Between the years 2015 and 2018, Defendant's gross, annual compensation without stock options ranged from approximately $272,000 to $325,000.

44.     Based on the base salary increase associated with Defendant's repeated promotions, her stock options, and the commissions she earned from her sales success, Defendant became one of the highest paid employees at Onward.

45.     In consideration of these and other benefits Defendant received pursuant to the Employment Agreement and incidental to her employment with Onward, Defendant agreed to,

among other obligations, refrain from engaging directly or indirectly in certain conduct both during and after the termination of her employment.

46.    Defendant's original Employment Agreement, which has been subject to non-material updates since 2009, states, among other provisions:

> **4.    <u>Disclosure of Information:</u>** You agree, during the term of this Agreement and at all times thereafter, to treat as confidential and, except as required in the performance of your duties under this Agreement, not to disclose, publish or otherwise make use of for yourself or for any other person, business, corporation or other entity or make available to the public, any trade secrets or other confidential information concerning the business, employees, clients, methods, operations, financing or services of the Company or any of its affiliates. You agree that all trade secrets and confidential information are the exclusive property of the Company. Trade secrets and confidential information shall mean all information in any way concerning the products, projects, activities, business or affairs of the Company acquired by you in the course of providing services to the Company, and not generally known in the industry.
>
> **6.    <u>Covenant Not to Compete:</u>**
> a.) You agree that you will not during the term hereof and for a period of one (1) year after termination of your employment, regardless of the cause of termination, in Woburn, MA or any other affiliated company office within a radius of sixty (60) miles from any such office engage in any business or perform any service, directly or indirectly, in competition with the business of the Company or any of its affiliates, or invest in, own, manage, operate, finance, control, or participate in the ownership, management, operation, financing, or control of, be retained by, associated with, lend your credit to, or render services or advice to, any business (regardless of how it is structured) that provides goods and services to persons and entities whose services, products or activities materially compete with the services, products or activities provided by, or engaged in, by the Company; provided, however, that you may purchase or otherwise acquire up to (but not more than) one percent of any class of securities of any Competing Business (but without otherwise participating in the activities of such Competing Business) if such securities are listed on any national or regional securities exchange or have been registered under Section 12(g) of the Securities Exchange Act of 1934. You agree that this covenant is reasonable with respect to its duration, geographical area, and scope.
>
> b.) In furtherance of the foregoing, and not in limitation thereof, you agree that you will not during the period of non-competition and within the geographical area herein set forth, directly or indirectly:
>
> > 1.  solicit or service in any way, on behalf of yourself or on behalf of or in conjunction with others, any client, customer or employee, or prospective

client, customer or employee, which has been solicited, serviced or engaged by the Company or any of its affiliates within twelve (12) months prior to the termination of this employment;

2. enter into any contract or arrangement for personal services or employment with any person who during the prior twelve (12) months was an employee or the Company or any of its affiliates or who provided personal services to the Company or any of its affiliates as an independent contractor.

3. you will not directly or indirectly, (1) induce or attempt to induce any employee of or consultant to Company to leave the employ of Company, (2) in any way interfere with the relationship between Company and any employee of Company, (3) employ, or otherwise engage as an employee, consultant or independent contractor, the services of any person who during the twelve (12) months prior to this termination was employed by the Company or engaged as a consultant or independent contractor of the Company (4) induce or attempt to induce any customer, supplier, licensee, or business relation of Company to cease doing business with Company, or in way interfere with the relationship between any customer, supplier, licensee, or business relation of Company, or (5) solicit from, or provide goods or services of the type that Company provides to, any person who is or was a customer of Company at any time during your employment with the Company.

4. you will not, at any time during or after your employment with the Company, knowingly disparage the Company or any of its affiliates.

### ***Defendant's Employment With Beacon***

47.     On January 25, 2019, Owens resigned from her employment with Onward. Upon information and belief, Defendant immediately joined Beacon, a direct Onward competitor, to work at its office located at 152 Bowdoin Street, Boston, in direct violation of the terms of her Employment Agreement.

48.     Defendant remains employed by Beacon and, on information and belief, is currently serving in a senior management role.

49.     The Beacon office in which Defendant works is located approximately one and a half miles from Onward's office in which she worked.

50.    Beacon like Onward, offers recruitment, staffing, and talent services in the digital, creative and marketing industries. According to Beacon's website, its Beacon Hill Associates division lists among its "Core Competencies" and the practice areas that it services, "**Creative, Marketing and Communications**. Proper messaging is crucial, from content to design to distribution, and we staff our clients with the market's best practitioners in this vibrant and important market sector." (See Beacon website URL: https://beaconhillstaffing.com/BH-Specialties/BH-Associates/Core-Competencies/Practice-Areas, a true and copy of which is attached hereto as Exhibit B).

51.    Beacon's website further states, "Beacon Hill Associates covers all industries, including but not limited to, Asset Management, Funds & Investments, Banking, Professional Services, High-Tech, Biotech, Pharmaceutical, Software, Manufacturing, Real Estate, Brokerage, Consulting & Executive Search Firms, Distribution, Healthcare, E-Commerce, and Retail." The same webpage lists among the "Job Roles & Positions" that it services: Research, Product and Communications Managers; Marketing Analysts, Graphic Designers, and Account Managers; Graphic Designers, Art Directors, and Copywriters; Online Programming Coordinators and Interaction Designers; and Usability Analysts and Production Associates.

52.    Onward offers these exact same services to clients in the same industries, as described in paragraphs 50 through 51 of this Complaint.

53.    As a result, Defendant is currently working in direct competition with Onward.

### ***Defendant Solicited Onward Employee Tim Sullivan to Leave Onward and Join Beacon***

54.    Defendant solicited Onward Director of Client Services Tim Sullivan ("Sullivan") and attempted to induce him to leave Onward and join her at Beacon.

55.    In 2018 Sullivan was Onward's highest billing recruiter and ranked eighth overall among 101 total producers in the company by gross margin profit.

56.    Sullivan has worked in the staffing and recruiting industry for approximately 13 years.

57.    He joined Onward's Boston office in October 2009 and has worked there since that time.

58.    On Tuesday, February 12, 2019 at 7:45 pm, Sullivan received a phone call from Lindsey Kaplan ("Kaplan"), the Regional Director at Beacon.  She told him that Beacon was looking for a lead recruiter for its creative division and that Sullivan had come highly referred. Sullivan asked who had referred him, and Kaplan responded that it was Owens.  Kaplan said Owens told her that Sullivan was one of the best recruiters she had ever worked with and that Beacon was looking for the best.

59.    Prior to this phone call, Sullivan did not have any conversations with Defendant regarding opportunities with Beacon.  Until this time, he otherwise had no communication with any representative of Beacon. Sullivan never spoke to Kaplan prior to the February 12, 2019 phone call.

60.    On Saturday, February 16, 2019 Sullivan met Defendant for lunch at Gaslight Lynnfield in Lynnfield, Massachusetts.  Defendant and Sullivan scheduled the lunch with Owens to catch up with her before he received the phone call from Kaplan.

61.    During the lunch, Sullivan agreed to attend an interview at Beacon.  By the end of the lunch, Defendant had arranged for Sullivan to interview at Beacon at 4:00 pm on Monday, February 18, 2019.

62.    Defendant, along with Kaplan and another Beacon recruiter, attended the interview.

Most of the interview was dedicated to selling Sullivan on the merits of working for Beacon.  At one point, Kaplan said she would love for Sullivan to come work with them at Beacon and asked what it would take for him to join her at Beacon. Sullivan said he would need more time to decide.

63.     During the interview, Sullivan was asked about his current compensation at Onward. Sullivan told them his guaranteed salary at Onward was approximately $92,000 and that his total annual compensation was around $140,000 or $150,000, including commissions. Defendant verbally confirmed to her colleagues that these compensation figures were accurate.

64.     Two days later, on Wednesday, February 20, 2019, Defendant texted Sullivan that the compensation aspect of an offer to join Beacon was looking promising for him.  Defendant made further arguments over text to convince Sullivan to join Beacon, stating, among other things, that if he joined Defendant at Beacon they could make a lot of money together.

65.     Later in the day on Wednesday, February 20, 2019, Sullivan called Defendant to follow up on the offer.  During this phone conversation, Defendant told Sullivan that Beacon could offer him a non-recoverable draw of $150,000, subject to further increases based on commission. While Defendant did not make an explicit comparison, this verbal offer was substantially more than Sullivan's current $92,000 guaranteed salary at Onward.  Sullivan told Owens he needed more time to think about it.

### ***Defendant Solicited and Hired Away Onward Employee Julie Rosenthal to Leave Onward and Join Beacon***

66.     Upon information and belief, Defendant was directly involved in soliciting and hiring Julia Rosenthal ("Rosenthal") from Onward to join Defendant at Beacon.

67.     Onward hired Rosenthal as a "Creative Recruiter" on January 7, 2019.  As the head of the Boston office with responsibility for hiring, Defendant played a key role in hiring Rosenthal.

68.     Rosenthal was a 2016 college graduate, and she only had seven months of administrative support for recruiting when Onward hired her.

69.     On February 28, 2019 at approximately 8:00 am, Rosenthal called Doug Noble ("Noble"), the Vice President of the Onward Boston office, to announce that she was resigning from Onward.  The call was very brief; Rosenthal hung up the phone as soon as Noble attempted to question her.  Onward attempted to call Rosenthal's cell phone at approximately 11:00 am the same day, but the call went straight to Rosenthal's voicemail.

70.     The next day, February 28, 2019, Onward President and Chief Operating Officer Michael Ondocin called Beacon's Boston office and asked for Julia Rosenthal.  The Beacon employee who answered the phone offered to forward the call to Rosenthal at Beacon.

### *Defendant Solicited Onward Customers*

71.     Upon information and belief, Defendant was directly involved in soliciting at least four of Onward's major clients after Defendant joined Beacon.

### *Broadleaf/BBH*

72.     Broadleaf /BBH ("Broadleaf") is an Onward client that was managed by Defendant until her departure from Onward.

73.     On February 15, 2019, Onward Business Development Manager Megan Tierney ("Tierney") had a conversation with Haley Dowling ("Dowling"), Program Manager at Broadleaf, in which Tierney introduced herself as the new contact from Onward who would be managing the Broadleaf account because Defendant was no longer with Onward.

74.     In response, Dowling said she had received a voicemail on her cellphone from Defendant earlier in the week in which Defendant said she was working for Beacon Hill Staffing and wanted to connect.

15

75.     Upon information and belief, Defendant used the trade secrets she acquired regarding Broadleaf during her time at Onward to solicit Broadleaf less than a month after resigning from Onward.

### *Cantina*

76.     Cantina has been an Onward client for six years.  Onward Business Development Manager Kate O'Connor ("O'Connor") has always managed that account.  Jolene Bussiere ("Bussiere") is the contact at Cantina.

77.     On February 26, 2018, O'Connor had the following email exchange with Bussiere (attached as Exhibit C).

    a.  From: Jolene Bussiere
       Date: Tuesday, February 26, 2019 at 1:20 PM
       To: Kate O'Connor
       Subject: Re: Great to see you!

       Hey Kate!
       I just got a call on my cell from LeeAnn over at Beacon Hill Staffing but she referenced Onward and said that she wanted to start working together again. Is this the woman that you and Meg were talking about when we had drinks?
       …
       Jolene

    b.  From: Kate O'Connor
       Date: Tuesday, February 26, 2019 at 3:16 PM
       To: Jolene Bussiere
       Subject: Re: Great to see you!

       … Anyways thank you so much for the note on Leanne. That is my former boss and crazy she is being so bold but really appreciate you letting me know.
       …
       Cheers,
       Kate

    c.  From: Jolene Bussiere
       Date: Tuesday, February 26, 2019 at 4:05 PM
       To: Kate O'Connor
       Subject: Re: Great to see you!

You are very welcome. I was taken aback when she called my cell and asked if I remembered working with her and even more shocked that she was so brazen about it.
…
Talk soon,
Jolene

78.     While Cantina was a longstanding Onward client with whom Onward has made many placements over the years, during Defendant's Onward employment she would not have had a business reason to interact with Bussiere or possess Bussiere's cell phone number.

79.     Bussiere's cell phone number was listed in Bullhorn.

80.     Upon information and belief, shortly before her resignation from Onward, Defendant identified Bussiere as the contact at a long-standing Onward client and obtained Bussiere's cell phone number from Bullhorn.  Approximately one month after resigning from Onward, Defendant used these Onward trade secrets to solicit Cantina.

### *Mintz Levin*

81.     The law firm of Mintz Levin was an Onward client managed by Defendant from 2015 until Defendant's departure. Ashley Itson ("Itson"), the head of human resources, was Onward's contact at Mintz Levin.

82.     After Defendant's departure from Onward, O'Connor contacted Itson to introduce herself as the new account manager from Onward for the Mintz Levin account.  Itson later contacted O'Connor because a candidate that Onward had placed at Mintz Levin had left and Mintz Levin needed a new candidate to replace him.

83.     On February 28, 2019, during an 11:00 am meeting, Itson told O'Connor that Defendant called Itson while at Beacon within the prior week.  Itson told O'Connor that Defendant said Beacon had worked with Mintz Levin in the past, said that Defendant knew the candidate who

17

Onward had placed at Mintz Levin recently departed, and suggested that Mintz Levin must now have a need.

84. Defendant attempted to conduct business with Mintz Levin to fill the role that Onward previously handled for Mintz Levin.

85. Upon information and belief, Defendant used the trade secrets she acquired regarding Mintz Levin during her time at Onward to solicit Mintz Levin approximately one month after resigning from Onward.

### *Fidelity Investments*

86. Fidelity Investments ("Fidelity") has been a longstanding and valuable client for Onward that Defendant managed during her Onward employment. In fact, Fidelity consistently was Onward's top value client company-wide for the last three years.

87. The loss of Fidelity as a client would have a significant impact on Onward's business.

88. When Defendant left Onward, the numerous contacts at Fidelity were assigned to different Onward employees. O'Connor was assigned to Dusan Koljensic ("Koljensic"), the head of Fidelity Labs, an incubator within Fidelity. O'Connor had worked with Koljensic in the past when he was the contact person at a different Onward client.

89. During a meeting with Koljensic on the afternoon of February 28, 2019, he told O'Connor that Defendant had contacted him from Beacon the day after Defendant left Onward. Koljensic said that Defendant had asked Koljensic if they could work together again now Defendant was at Beacon.

90.     Upon information and belief, Defendant used the trade secrets she acquired regarding Fidelity during her time at Onward to solicit Fidelity approximately one month after resigning from Onward.

### *ExtensionEngine*

91.     ExtensionEngine is a client of Onward which Onward in the process of placing a candidate at ExtensionEngine for an open, creative professional role.

92.     The client contact at ExtensionEngine is Scout Stevenson.

93.     Defendant was working on this placement for Onward prior to her resignation.

94.     On March 6, 2019, Defendant emailed Scout Stevenson from her Beacon email address to propose a sample presentation for a candidate and to schedule a time to speak with Scout Stevenson about the candidate.  (Attached as Exhibit D).

95.     Defendant sent the email exchange with Scout Stevenson to the email account for Julia Rosenthal at Onward, which is the first time that Onward learned of Defendant's conducting business with ExtensionEngine on behalf of Beacon.

96.     Defendant's pirating away ExtensionEngine and the opportunity she had been handling on behalf of Onward for ExtensionEngine using Onward's confidential information and trade secrets and Onward's former employee, Rosenthal, without missing a step is the hallmark of unfair competition as well as a violation of her Employment Agreement.

## AS AND FOR A FIRST CAUSE OF ACTION

### (Breach of Contract)

97.     Onward repeats and realleges each and every allegation contained in paragraphs 1 96 of this Complaint as if fully set forth herein.

98.     The Employment Agreement between Onward and Defendant constitutes a valid and enforceable contract.

99.     Onward fully performed its obligations under the Employment Agreement with Defendant.

100.     Pursuant to the Employment Agreements, for twelve months following her separation from Onward, Defendant is obligated to refrain from competing against Onward within a radius of sixty (60) miles of any Onward office location from which she last worked for Onward.

101.     Pursuant to the Employment Agreement, for twelve months following her separation from Onward, Defendant is obligated to refrain from soliciting employees of Onward during the last twelve months prior to her termination.

102.     Pursuant to the Employment Agreement, for twelve months following her separation from Onward, Defendant is obligated to refrain from soliciting clients of Onward during the last twelve months prior to her termination.

103.     Pursuant to the Employment Agreement, Defendant is obligated to maintain Onward's confidential information and confidential trade secrets and not to use them for anyone other than Onward.

104.     Defendant breached the Employment Agreement by competing against Onward through her employment with Beacon in Boston, which office is located approximately one and a half miles of Onward's Boston office, and upon information and belief.

105.    Defendant breached the Employment Agreement by soliciting Onward's employees to leave Onward and join Beacon including hiring one Onward employee and recruiting at least one other Onward employee, and upon information and belief.

106.    Defendant breached the Employment Agreement by soliciting Onward's clients to cease doing business with Onward and to conduct business with her at Beacon.

107.    Defendant breached the Employment Agreement by misappropriating Onward's confidential information and trade secrets to conduct her unlawful solicitation.

108.    As a consequence of the foregoing, Onward has suffered, and will continue to suffer, harm and loss, some of which is irreparable for which there is no adequate remedy at law.

## AS AND FOR A SECOND CAUSE OF ACTION

### (Breach of Covenant of Good Faith and Fair Dealing)

109.    Onward repeats and realleges each and every allegation contained in paragraphs 1 through 108 of this Complaint as if fully set forth herein.

110.    By virtue of her conduct, Defendant breached her implied covenant of good faith and fair dealing with Onward.

111.    As a consequence of the foregoing, Onward has suffered, and will continue to suffer, harm and loss, some of which is irreparable for which there is no adequate remedy at law.

## AS AND FOR A THIRD CAUSE OF ACTION

### (Unfair Competition)

112.    Onward repeats and realleges each and every allegation contained in paragraphs 1 through 111 of this Complaint as if fully set forth herein.

113.    By the aforesaid acts, Defendant has committed acts of unfair competition against Onward.

114.    By the aforesaid acts, including the solicitation and hiring away of an Onward

employees within weeks of her Defendant's at Beacon and soliciting and attempting to induce least one other employees to leave Onward from an office of just seven remaining employees, Defendant interfered with and disrupted the Onward Boston office, thereby committed acts of unfair competition against Onward.

115.    Defendant's solicitation of these employees is unjustified and designed to injure and impair Onward's good will with clients.

116.    Defendant further solicited five Onward clients and is conducting business with at least one of them using Onward's confidential information and trade secrets usurping the opportunity she was handling on behalf of Onward with ExtensionEngine further unfairly competing with Onward.

117.    Defendant seeks to reap what she has not sown.  Her conduct was predatory, unjustified, deceitful, in bad faith, and exploited Onward's confidential and proprietary information and trade secrets.

118.    The actions of Defendant were committed with malice and with the intent of harming and/or destroying Onward's business.

119.    Accordingly, Defendant is liable to Onward in an amount to be decided at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Onward respectfully requests that the Court grant the following relief:

a.    An Order permanently enjoining and prohibiting Defendant from further unfair methods of competition and unfair or deceptive acts or practice;

b.    An Order permanently enjoining and prohibiting Defendant from competing against Onward in violation of the Employment Agreement;

c.      An Order permanently enjoining and prohibiting Defendant from wrongfully soliciting or interfering with Onward's relationship with its employees;

d.      An Order permanently enjoining and prohibiting Defendant from wrongfully soliciting or interfering with Onward's corporate and individual clients and customers;

e.      An Order requiring the immediate return of Onward's trade secrets and confidential information in Defendant's possession;

f.      Judgment against Defendant for compensatory and punitive damages, plus costs, interests, and reasonable attorneys' fees; and

g.      Such other and further relief as this Court may deem proper.

Dated at Boston, MA
this 8th day of March, 2019

Respectfully submitted,

**NELSON MULLINS RILEY &
SCARBOROUGH LLP**

/s/  James S. Rollins
James S. Rollins
james.rollins@nelsonmullins.com
Federal Bar No. CT05795
Mitchell Boyarsky*
mitch.boyarsky@nelsonmullins.com
Steven Joseph*
steve.joseph@nelsonmullins.com
Nelson Mullins Riley & Scarborough LLP
One Post Office Square, 30th Floor
Boston, MA  02109
T 617-217-4700
F 517-217-4710
*Motions for Admission to Practice *Pro Hac Vice* pending